UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 14-CV-5500 (JFB)
_____

ROSE MARIE WILSON,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____

**MEMORANDUM AND ORDER**
August 16, 2016
_____

FILED
CLERK
8/16/2016 2:29 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

JOSEPH F. BIANCO, District Judge:

Plaintiff Rose Marie Wilson ("plaintiff"), proceeding *pro se*, commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, the Commissioner of Social Security ("defendant" or "Commissioner"), denying plaintiff's application for disability insurance benefits ("DIB"). An Administrative Law Judge ("ALJ") found that plaintiff had the residual capacity to perform her past relevant sedentary work as a data entry clerk, satisfying the applicable range of sedentary work as defined by 20 C.F.R. § 404.1567(a). Thus, the ALJ determined that the plaintiff was not disabled and not entitled to benefits. The Appeals Council denied plaintiff's request for review.

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons stated herein, the Court denies the Commissioner's motion for judgment on the pleadings and grants plaintiff's motion to remand. Accordingly, the case is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order. Remand is warranted because the Appeals Council failed to properly weigh the May 24, 2014 addendum submitted by Dr. Smith.

I. BACKGROUND

A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

1

1. Personal and Work History

Plaintiff was born on December 5, 1950, and was sixty three years old at the time of the ALJ's decision. (AR at 35.) Plaintiff graduated from high school and college, and obtained a master's degree in library science. (AR at 36, 152.)

In 1997, plaintiff began working part-time as a librarian for a technical school, then was converted to full-time from 1998 to March 2004. (AR at 37, 40.) In this role, plaintiff catalogued and shelved books, and entered data into the library computer. (AR at 37-38.) At the time of the ALJ's decision, she worked two hours a week in this position. (AR at 40, 152.) Plaintiff previously worked through a temporary employment agency, doing clerical work for various companies. (AR at 38, 152.) Plaintiff also worked for a school for developmentally disabled children as an administrative assistant, performing data entry. (AR at 39, 152.) She also worked as a data conversion operator for the United States Postal Service, where she did data entry. (AR at 36-37, 179.)[1] Plaintiff is insured for DIB through September 30, 2016. (*See* AR at 114, 135-42.)[2]

On December 4, 2012, plaintiff completed a "Function Report," which detailed her daily activities and how her condition affected her ability to perform various tasks. (AR at 168-78.) Plaintiff indicated that weakness and pain in her back made it difficult to lift or carry anything over five to ten pounds, and that back and knee pain made it impossible to stand for more than five to ten minutes. (AR at 173.) Plaintiff reported that these conditions made it impossible for her to walk more than 100 feet at a time, and she stated that she must use a cane and rest every 100 feet. (*Id.*) If she had to walk a long distance, she used a walker. (AR at 174.) Plaintiff stated that after sitting for forty-five minutes, knee pain would force her to stand up and "walk a little bit." (*Id.*) Plaintiff stated that, if she sat for several hours in the same chair, her back would start to hurt, and sitting in a hard chair made her back "hurt sooner." (*Id.*) She also stated that she had problems getting up from a chair or sofa that was "too low and/or too soft." (*Id.*) Plaintiff reported difficulty with stairs and stated that she could make it up two to three stairs "very cautiously" and "must have a handrail." (*Id.*) She stated that she could not kneel, squat, or bend down and reach under a table. (*Id.*) She also reported that she could not stand on her tiptoes without pain. (*Id.*) Plaintiff indicated that she sometimes had difficulty paying attention and was unable to finish projects due to pain in her back and knees. (AR at 175.) She stated that she did not have trouble following spoken or written directions, unless the instructions were too long and complicated. (*Id.*) Plaintiff indicated that she had an "excellent memory" and had no problems getting along with family, friends, or people in authority. (AR at 173, 175-76.) Plaintiff also stated that she did not handle stress well. (AR at 176.)

Plaintiff reported radiating back pain since 1980, knee pain since 1998, foot pain since 2000, a heel spur since 2009, and a thumb sprain in 2012. (AR at 176-77.) Plaintiff also described hip pain beginning in 2008, which was "cured by replacement" in 2010. (AR at

---

[1] This job is not included in plaintiff's job history as a job plaintiff had fifteen years before she allegedly became unable to work. (AR at 152.) However, this position is listed in her Work History Report and was addressed by the ALJ in the hearing. (AR at 36-37, 179.)

[2] On October 29, 2012, plaintiff was awarded Social Security Retirement benefits beginning January 2013. (AR at 71-73.)

176.) She indicated that the pain first began to affect her activities in 1980, with the onset of the back pain. (*Id.*) Plaintiff described her back pain as "sore, achy, weak, and tired," her knee pain as a "general dull ache all the time" and "sharp pain" when mobile, and her heel pain as "sharp, biting, shooting." (*Id.*) Plaintiff also reported "stabbing, shooting plain when getting in and out of a car or standing in one place too long." (*Id.*) Plaintiff indicated that medical treatment for her pain consisted of prescription pain medication as needed. (AR at 176-77.) Plaintiff reported that she does not need any special help or reminders to take care of her personal needs and grooming, or to take medication. (AR at 170.) Plaintiff indicated that she used a raised toilet seat and support arms to use the toilet, and that she is unable to use a toilet that is too low. (*Id.*) Plaintiff reported that she cannot wear any clothing that closes in the back because she cannot reach behind her back. (AR at 169.) Plaintiff stated that she cannot get in and out of the tub to take a bath or shower so she used the sink to bathe. (*Id.*) Plaintiff stated she only shaved occasionally. (AR at 170.) Plaintiff reported that she prepared her own meals and that they were easy, simple recipes. (*Id.*) She stated that her cooking habits had changed in that she prepared fewer recipes, and if she prepared "something complicated" she would have to stop periodically to rest. (AR at 171.) Plaintiff reported that she would go out once or twice a day, but that she had to be very careful because if she fell, she could not get up without help. (*Id.*) Plaintiff stated that she could go out alone, whether walking or driving a car. (*Id.*) Plaintiff indicated that she had a driver's license and drives herself, but had trouble getting in and out of the car due to knee pain. (AR at 171-72.)

Plaintiff reported that she lives alone, cares for her pet cats, and grocery shops for both herself and a friend. (AR at 168-69.) She stated that her ability to handle money has not changed since her injuries began, and that she can count change, pay bills, and handle a savings account. (AR at 172.) Plaintiff indicated that her hobbies included reading, watching television, collecting various items, and listening to music. (*Id.*) Plaintiff reported that she enjoyed cooking and baking, but was unable to stand long enough to prepare complicated recipes due to her pain. (AR at 170-72.) Plaintiff noted that she visited her neighbor daily, spoke on the phone everyday with relatives and friends, and visited friends or cousins two to three times a year. (AR at 173.) Plaintiff reported that her social activities were impacted by her injuries in that she now avoided anything that required walking around. (*Id.*)

Plaintiff reported that she would get back pain when she stood, walked, or sat for too long. (AR at 177.) She reported knee pain when she sat down, stood up, climbed steps, got in and out of a car, and when she was "just walking." (*Id.*) Plaintiff reported pain in her heels when lying in bed and sometimes when walking or sitting. (*Id.*) Plaintiff noted that this pain would wake her up at night. (*Id.*) She indicated that her back pain lasted several hours, her knee pain was constant, and her heels hurt for several minutes at a time. (*Id.*) Plaintiff indicated that the pain was present every day and that her knee pain had become more severe over time. (*Id.*) Plaintiff reported taking tri-buffered aspirin, ibuprofen, Tramadol HCL, and Tylenol with codeine for her pain, and stated that they "take the edge off and make it bearable" but do not "make the pain go away entirely." (AR at 177.)

2. Medical History

Beginning on January 8, 2010, plaintiff was treated by Dr. Bradley White of Nassau Orthopedic Surgeons, P.C. (AR at 286-87.)

3

At the initial appointment, Dr. White noted that plaintiff was five feet, four inches tall and weighed 230 pounds, and that she had no remaining rotation or coronal plane potion about the left hip. (AR at 286.) He noted that motion was fairly well preserved in the right hip. (*Id.*) Dr. White reported "varus deformities and crepitus throughout motion" in both knees. (*Id.*) He noted that neurovascular status was normal. (*Id.*) X-rays of plaintiff's hips confirmed clinically suspected severe degenerative arthritis of the left hip and moderate degenerative change on the right side. (*Id.*) Dr. White noted that plaintiff's knees were significantly arthritic with severe end-stage osteoarthritis on the right and slightly less severe findings on the left. (*Id.*) Dr. White noted that plaintiff was more symptomatic on her right knee. (*Id.*) He stated that, ideally, plaintiff needed a left total hip arthroplasty and right total knee arthroplasty. (*Id.*) Dr. White recommended further weight reduction prior to planning surgery and prescribed Ultram as an analgesic. (*Id.*) At a follow-up appointment on May 20, 2010, Dr. White noted crepitus with left knee motion. (AR at 283.) Dr. Write noted that neurovascular status of the lower extremities, bilaterally, was intact, and again recommended left total hip and right total knee arthroplasty. (*Id.*)

On June 15, 2010, Dr. Carl Schreiber of North Nassau Cardiology Associates reported that a nuclear stress study was normal, and that plaintiff reported no chest pain, shortness of breath, or swelling. (AR at 298.) Plaintiff weighed 220 pounds, and her blood pressure was 130/60. (*Id.*) An electrocardiogram ("ECG") was essentially normal. (AR at 298; *see also* AR at 290.) Dr. Schreiber noted an impression of diabetes, hypertension, and obesity. (AR at 298.) He advised weight loss and diet. (*Id.*)

On June 21, 2010, x-rays taken at St. Joseph Hospital of plaintiff's left hip showed osteoarthritic degenerative changes of the hip articulation. (AR at 288.) Chest x-rays indicated no acute disease, but degenerative disease of the spine was noted. (AR at 289.)

On June 28, 2010, Dr. White performed a left total hip arthroplasty on plaintiff at St. Joseph Hospital. (AR at 234, 240-41, 293-94.) On June 29, 2010, plaintiff was referred to Dr. Nadron, who evaluated plaintiff and noted obesity, hypertension, diabetes mellitus, and status post total hip arthroplasty. (AR at 237.) Dr. Nadron noted that plaintiff's blood pressure was 108/70, heart sounds were regular, and her abdomen was soft nontender. (*Id.*) Dr. Nadron prescribed Cardizem, Metformin, and a diabetic diet. (*Id.*) Physical therapy was to follow. (*Id.*) On June 30, 2010, plaintiff treated with Dr. Vijay Shah after her hemoglobin level dropped following the surgery. (AR at 238-39.) Dr. Shah indicated that the anemia was most likely a result from her recent surgery, but recommended an anemia panel to rule out a nutritional deficiency and prescribed Procrit. (*Id.*)

On July 2, 2010, Dr. Kim, on consultation from plaintiff's primary physician, reported a blood pressure reading of 106/69. (AR at 236.) Dr. Kim reported that plaintiff had a history of hypertension with episodes of hypertension and that she was status-post open reduction and internal fixation. (*Id.*) Dr. Kim advised decreased medication dosages, and continuation of blood pressure and pulse rate monitoring. (*Id.*) On July 3, 2010, treatment notes from St. Joseph Hospital noted that plaintiff attended physical therapy and reported a pain level of two on a scale of one to ten. (AR at 235.) The notes indicate that plaintiff's hypertension was stable. (*Id.*)

In a "To Whom It May Concern" letter dated August 3, 2010, Dr. White stated that plaintiff was under his care for treatment of osteoarthritis of the hip and that she was able to work as of that date. (AR at 273.) Plaintiff returned to Dr. White for follow up appointments on August 3, August 31, September 29, and December 22, 2010. (AR at 268, 271-72, 274.) Dr. White indicated at each appointment that patient was doing very well post-surgery. (*Id.*) On December 22, 2010, Dr. White noted plaintiff was walking with a cane because of knee arthritis and was morbidly obese. (AR at 268.) Dr. White advised continued weight loss efforts, as he indicated plaintiff will need total knee arthroplasties once she loses weight. (*Id.*) Dr. White also prescribed Ultram as an analgesic. (*Id.*)

On April 20, 2011, plaintiff treated with Dr. Carlos Montero of Nassau Orthopedic Surgeons for another follow up appointment. (AR at 266.) Dr. Montero noted that plaintiff continued to do very well and advised continued weight loss and prescribed Ultram. (*Id.*) Dr. Montero reported that plaintiff complained of chronic lumbar pain and instructed her to fill out paperwork for further evaluation. (*Id.*) Dr. Montero also noted that they "will discuss possibility of permanent disability given her multiple Orthopedic problems." (*Id.*)

Plaintiff returned to Dr. Montero on May 4, 2011. (AR at 264-65.) Dr. Montero noted plaintiff's twenty-year history of intermittent and aching bilateral lumbar spine pain, which did not awaken her from sleep and did not radiate into her lower extremities. (AR at 264.) Dr. Montero noted that plaintiff reported multiple lower back injuries over the years, as well as increasing frequency of pain in the past three years with inability to walk more than 100 feet without having to sit and rest. (*Id.*) Dr. Montero also noted that plaintiff complained of intermittent leg weakness. (*Id.*) Dr. Montero reported that plaintiff was morbidly obese, with no abnormal spinal curvature, and in no apparent distress. (*Id.*) Dr. Montero reported that plaintiff's hamstrings were tight symmetrically and that stretch tests were negative. (*Id.*) He noted that plaintiff could ambulate on heels and toes but that her spinal motion was mildly restricted with pain at extreme ranges. (*Id.*) Dr. Montero reported that straight leg raising was negative. (*Id.*) Dr. Montero noted x-rays of the thoracolumbar spine showing multilevel degenerative disc disease (DDD) of the thoracic spine and severe multilevel lumbar DDD. (*Id.*) Dr. Montero indicated that his diagnostic impression was lumbar stenosis. (*Id.*) He advised heat, a home exercise program, and non-steroidal anti-inflammatories (NSAID) as needed. (*Id.*) Dr. Montero noted that plaintiff had stated that she could not afford formal physical therapy. (*Id.*) He reported that he counseled the plaintiff on weight loss and referred her for an MRI of the lumbar spine. (AR at 264-65.) Dr. Montero also noted that plaintiff asked if his diagnoses would qualify her for disability, and he stated that given the clinical findings and plaintiff's history of being unable to walk 100 feet, she would qualify for disability. (AR at 265.)

On May 12, 2011, plaintiff was seen at St. Joseph Hospital's Emergency Department for abdominal pain. (AR at 230-33.) A chest x-ray showed clear lungs. (AR at 233.) A computed tomography (CT) scan showed a nonspecific bowel gas pattern with prominent dilated bowel loop in the left upper quadrant, possibly colon. (AR at 232.) CT scan findings also showed degenerative changes of the spine and right hip. (*Id.*)

On June 8, 2011, an MRI of plaintiff's lumbar spine demonstrated right foraminal

disc protrusion and bilateral degenerative facet hypertrophy with resultant mild central canal spinal stenosis and encroachment on the exiting right L5 nerve root. (AR at 252-53, 276.) The MRI also showed disc protrusion with annular fissure and hypertrophy with moderate to severe spinal stenosis and moderate neural foramina at L4-L5. (AR at 277.) The MRI also demonstrated disc protrusion with moderate stenosis, foramina narrowing at L2-L3, as well as nerve root encroachment and a mild diffuse bulge at L3-L4 with mild stenosis with no evidence of neural foraminal narrowing. (*Id.*)

Plaintiff returned to Dr. Montero on July 11, 2011, and Dr. Montero diagnosed lumbar stenosis. (AR at 263.) Dr. Montero reported that plaintiff declined a formal course of physical therapy, oral steroids, or epidural steroids. (AR at 252.) He prescribed Mobic and noted that plaintiff was informed that her inability to walk more than 100 feet without pain would qualify her for disability. (*Id.*)

On October 17, 2011, Dr. Montero saw plaintiff for a follow up of bilateral knee osteoarthritis. (AR at 261.) Upon physical examination, Dr. Montero reported bilateral knees with moderate valgus deformity and significant crepitus with range of motion symmetrically. (*Id.*) He reported right knee range of motion from 10 degrees to 125 degrees and left knee range of motion from 5 degrees to 125 degrees. (*Id.*) He reported no ligamentous laxity appreciated. (*Id.*) Patella compression signs were positive symmetrically, and apprehension sign was negative symmetrically. (*Id.*) He also reported that bilateral hip range of motion was full and painless. (*Id.*) Based on x-ray findings, Dr. Montero reported his impression as severe tricompartmental osteoarthritis, right greater than left. (*Id.*) Dr. Montero stated that plaintiff declined cortisone injections and a formal course of physical therapy. (*Id.*) Dr. Montero reported providing a home exercise program, encouraging weight loss, prescribing Mobic, and referring plaintiff for a consultation with Dr. White to discuss a possible total knee arthroplasty. (*Id.*)

Plaintiff returned to Dr. White on November 30, 2011. (AR at 311-12.) Plaintiff reported increasing problems with her knees, right knee more so than left. (AR at 311.) Her medications included Atacand, Clonidine, Diltiazem, Lipitor, Metformin, and Ultram. (*Id.*) Upon physical examination, Dr. White reported that plaintiff weighed approximately 250 pounds and that there was no swelling or ecchymosis noted in the lower extremities. (*Id.*) Dr. White noted valgus deformity in the right knee, much less so in the left knee. (*Id.*) He reported that both knees had crepitus with range of motion, more marked on the symptomatic right knee. (*Id.*) X-rays of the right knee showed severe tricompartmental osteoarthritis with valgus deformity. (*Id.*) Dr. White also reported that plaintiff had noted some discomfort in her left hip recently. (*Id.*) X-rays showed satisfactory position of all the prosthetic components of left total hip arthroplasty. (*Id.*) Dr. White indicated that his impression was status post left total hip arthroplasty with some recent thigh pain, likely muscular, and severe tricompartmental osteoarthritis of the right knee. (AR at 312.) Dr. White advised a right total knee arthroplasty and recommended that plaintiff use a cane for her symptomatic left hip and right knee. (*Id.*) He noted that plaintiff was taking Ultram for pain as needed. (*Id.*) Dr. White noted his recommendations to plaintiff regarding weight reduction and indicated that she may be a candidate for gastroplasty or lap band surgery. (*Id.*) He also reported some stasis dermatitis about the right pre-tibial region, which precluded scheduling a left total knee arthroplasty at the present time,

and indicated that plaintiff will consult a dermatologist "regarding same." (*Id.*)

Plaintiff saw Dr. White for a follow up on December 21, 2011, at which point the achiness and pain in her left hip had resolved. (AR at 310.) Dr. White noted good motion in the left hip without pain. (*Id.*) Dr. White reported that plaintiff had noted some occasional low back pain, which was being treated elsewhere. (*Id.*) Dr. White indicated, upon physical examination of the plaintiff, a severely arthritic right knee, with a full range of motion with valgus deformity and severe crepitus with range of motion. (*Id.*) He stated that no effusion or ligamentous laxity was noted. (*Id.*) Dr. White indicated that his impression was severely arthritic right knee and eighteen months status post total left hip arthroplasty. (*Id.*) Dr. White advised plaintiff that she will require a right total knee arthroplasty in the near future, to continue all efforts at weight reduction, and that she may be a candidate for lap-band surgery or gastroplasty. (*Id.*)

On May 22, 2012, plaintiff saw Dr. Schreiber for follow up of hypertension. (AR at 304-07.) Dr. Schreiber stated that plaintiff related having no light headedness or dizziness, chest pain, shortness of breath or palpitations. (AR at 304.) He noted that plaintiff occasionally took Tylenol with codeine for pain, and that plaintiff was not very active because of arthritis in her knees and admitted to dietary noncompliance. (*Id.*) He noted that plaintiff was working part-time. (*Id.*) Dr. Schreiber reported that, upon examination, plaintiff was in no respiratory distress and respiratory rhythm, effort, heart rate, and heart rhythm were all normal. (AR at 305.) He reported that plaintiff's blood pressure was 147/84 and that she was obese. (*Id.*) He noted that heart sounds were normal, and there were no murmurs or peripheral edema present. (*Id.*) Dr. Schreiber reported an assessment of obesity, hypertension, diabetes mellitus, and arthritis. (AR at 305-06.) He advised sodium restriction, diet, and weight loss. (AR at 306.) Dr. Schreiber renewed plaintiff's pain medication to take as necessary and referred plaintiff for periodic blood testing. (*Id.*)

On June 20, 2012, plaintiff visited Dr. White for a long term follow-up appointment for two year status post left total hip arthroplasty. (AR at 309.) Dr. White noted that plaintiff was doing very well and that x-rays of the left hip showed satisfactory position of all prosthetic components from the left total hip arthroplasty without signs of loosening or wear. (*Id.*) He stated that her "main problem is that of morbid obesity." (*Id.*) Dr. White reported that plaintiff had a severely arthritic right knee with complaints of left knee pain as well. (*Id.*) On examination, Dr. White reported that plaintiff's right knee showed severe crepitus with motion and valgus deformity. (*Id.*) He reported that her left knee also had valgus deformity, which was less marked with crepitus throughout range of motion. (*Id.*) Dr. White reported that the knee examination was otherwise unremarkable. (*Id.*) He noted equal leg lengths, normal neurovascular status in lower extremities, and good motion of the left hip without pain. (*Id.*) Dr. White cited x-rays of the right hip showing moderate arthritis. (*Id.*) He also cited x-rays of bilateral knees in AP/lateral and standing views, which showed severe osteoarthritis bilaterally, more marked on the right side with valgus deformity. (*Id.*) Dr. White wrote his diagnostic impression as that of severe bilateral osteoarthritis. (*Id.*) He indicated that he counseled plaintiff in weight reduction and discussed the possibility of Supartz injections, and that the plaintiff would check if her insurance plan would cover the cost. (*Id.*) Dr. White advised plaintiff to return in one year for an annual x-ray of her left hip

7

and as needed for pain in her knees and right hip. (*Id.*)

Plaintiff visited Dr. Meena Nadroo on June 27, 2012 for a checkup. (AR at 343.)[3] Dr. Nadroo reported controlled/stable hypertension, morbid obesity, osteoarthritis, stable hyperlipidemia, and diabetes mellitus, which was stable on Metformin. (*Id.*) Dr. Nadroo noted that plaintiff had no new complaints. (*Id.*) Plaintiff returned to Dr. Nadroo for a routine checkup on September 12, 2012. (AR at 342.) Dr. Nadroo's September 12 assessment of plaintiff was very similar to her June 27, 2012 report. (*See* AR at 342-43.) However, in the September 12, 2012 report, Dr. Nadroo noted that plaintiff complained of knee pain. (AR at 342.) Dr. Nadroo reported that plaintiff had no shortness of breath, dizziness, or chest pain. (*Id.*) Dr. Nadroo prescribed Tramadol, as needed. (*Id.*)

On October 3, 2012, Dr. Nadroo saw plaintiff again and reported that plaintiff complained of knee pain, prompting Dr. Nadroo to refer her to an orthopedist. (AR at 341.) Dr. Nadroo's assessments remained unchanged from prior visits, and she described plaintiff's hypertension as controlled. (*Id.*) Dr. Nadroo noted that plaintiff had no headaches, visual symptoms, or chest pain and reported that plaintiff's chest was clear, heart sounds were regular, abdomen was soft and non-tender, and there was no extremity edema. (*Id.*) Dr. Nadroo advised diet, exercise, and weight loss. (*Id.*)

On November 21, 2012, Dr. Joseph Burke of Cherrywood Foot Care completed a treatment summary report, indicating that he had treated plaintiff every one to two months since August 13, 2001. (AR at 320-24.) Dr. Burke reported diagnoses of onychomycosis, pain, and bursitis. (AR at 320.) He indicated treatment of patient at various times for "various foot problems," including toenail care, ingrown nails, and heel pain. (AR at 321.) He noted plaintiff's expected duration and prognosis of her condition as "excellent." (*Id.*) Dr. Burke noted that plaintiff's first treatment was in June 2009 and that she had diabetes as well as osteoarthritis and toenail fungus. (*Id.*) Dr. Burke did not note any clinical or laboratory findings. (AR at 322.) He indicated that plaintiff did not wear any orthodic appliances, and, when asked to assess range of motion, Dr. Burke wrote "N/A." (*Id.*) Dr. Burke also checked the box indicating no significant abnormality in gait. (AR at 323.) He stated that plaintiff does not require an assistive device to walk. (*Id.*) When asked to describe any limitations on physical activity as demonstrated by fatigue, palpitations, dyspnea, or angina discomfort, Dr. Burke wrote "N/A." (*Id.*) Dr. Burke also checked a box indicating that he could not provide a medical opinion regarding plaintiff's ability to do work-related activities. (AR at 324.)

Dr. Terry Scheid, an optometrist, completed a treatment summary report on November 19, 2012. (AR at 327-31.) Dr. Scheid reported plaintiff's corrected vision as 20/20. (AR at 327.) Dr. Scheid checked a box indicating that he could not provide a medical opinion concerning plaintiff's ability to perform work-related activities. (AR at 331.)

On December 12, 2012, Dr. Nadroo treated plaintiff on a routine visit and noted that plaintiff complained of body aches, back and knee pain, and shortness of breath when walking. (AR at 339.) Dr. Nadroo reported that plaintiff's chest was clear, her abdomen

---

[3] Dr. Nadroo was plaintiff's primary care physician between January 19, 2009 and around October 2013. (*See* AR at 45, 334.)

8

was soft and non-tender, pulse was intact, and there was no extremity edema. (*Id.*) Dr. Nadroo noted that plaintiff's blood pressure was 126/76. (*Id.*) Dr. Nadroo reported her assessment as obesity, hypertension (stable), and diabetes mellitus, and prescribed Mobric for body pain. (*Id.*)

On December 12, 2012, Dr. Nadroo completed a treatment summary report. (AR at 334-38.) Dr. Nadroo reported that she had first seen the plaintiff on January 19, 2009. (AR at 334.) She noted plaintiff's diagnosis consisted of hypertension, obesity, diabetes mellitus II, hyperlipidemia, osteoarthritis, hip replacement, chronic pain syndrome, and history of bowel obstruction and hysterectomy. (*Id.*) Dr. Nadroo reported plaintiff's current symptoms as joint and back pain, obesity, difficulty ambulating, and difficulty sitting for long durations. (*Id.*) Dr. Nadroo indicated that plaintiff will need life-long treatment. (AR at 335.) Dr. Nadroo reported that plaintiff had difficulty walking more than 100 feet without taking a rest and climbing stairs, that her body mass index was thirty-eight, and that she was unable to kneel, sit, squat, or lift weight. (*Id.*) Dr. Nadroo reported clinical findings of blood pressure 128/76, S1 and S2 heart sounds, 4/5 motor strength, and an inability to bend at the spine, bend knees, or flex at the hip. (AR at 336.) Dr. Nadroo also reported that fatigue and shortness of breath were present with minimal exertion and routine daily activity. (*Id.*) Dr. Nadroo noted that plaintiff needed to rest 30 minutes to 1-2 hours once the fatigue begins, and that plaintiff had difficult losing weight and keeping up with physical therapy. (*Id.*) Dr. Nadroo also noted the presence of depression due to pain and fatigue. (*Id.*) Dr. Nadroo checked boxes indicating that plaintiff was limited with lifting and carrying, and noted that plaintiff was unable to lift weights because of back pain. (AR at 337.) Dr. Nadroo reported that plaintiff was limited with standing and walking to less than two hours a day, and that plaintiff was unable to walk more than 100 feet. (*Id.*) Dr. Nadroo also reported that plaintiff's ability to sit was limited due to her high risk for blood clots. (*Id.*) Dr. Nadroo also checked a box indicating that plaintiff was limited for pushing and pulling. (*Id.*)

On June 13, August 15, and November 21, 2013, plaintiff treated with Dr. Sushil Sagar of Long Island Kidney Associates. (AR at 377-85.) Dr. Sagar's June 13, 2013 assessment included diabetes mellitus, hypertension, obesity, osteoarthritis, herniated disc (L3-L4), herniated disc (T11-T12), lumbar disc degeneration (L2-L3), lumbar disc degeneration (L3-L4), lumbar canal stenosis, and hyperlipidemia. (AR at 378-79.) However, Dr. Sagar's August 15, 2013 assessment included diabetes mellitus, hyperlipidemia, hypertension, obesity, osteoarthritis, edema, and hypomagnesaemia. (AR at 382.) Dr. Sagar's November 21, 2013 assessment included diabetes mellitus, edema, obesity, hyperlipidemia, and hypertension. (AR at 385.) On June 13, Dr. Sagar recommended weight reduction, and on August 15 and November 21, he advised fluid restriction in addition to weight reduction. (AR at 379, 381, 385.) On August 15 and November 21, Dr. Sagar prescribed Furosemide for edema. (AR at 381, 385.)

On December 26, 2013, plaintiff returned to Cherrywood Foot Care and was treated by Dr. Peter Smith for a possible fungal infection on her toenail. (AR at 397-98; *see also* 400-02.) Dr. Smith noted debris under plaintiff's toenail but noted that there were no signs of bacterial infection. (AR at 398.) Dr. Smith reported no edema of the lower extremities, pedal pulses as 2/4 and symmetrical, lower extremity muscle strength and range of motion as equal and

symmetrical bilaterally. (*Id.*) Dr. Smith noted that the spine, hips, and knees were in normal alignment, and that the ankle alignment and range of motion and foot structure were normal. (*Id.*) Dr. Smith reported that subtalar, metatarsal, and metatarsal-phalangeal joint range of motion was within normal limits. (*Id.*) Dr. Smith graded plaintiff's lower extremity deep tendon reflexes at 2/4 and symmetrical. (*Id.*) He indicated "plantar reflexes (Bankinski) toes were downgoing," and there was no ankle clonus. (*Id.*) Dr. Smith reported that sensory testing of the lower extremities was intact for sharp/dull sensation, position, vibration, and monofilament sensation was intact. (*Id.*) He noted that there was no evidence of posterior tibial, superficial peroneal, or sural nerve pathology, and no evidence of intermetatarsal neuroma bilaterally. (*Id.*) Dr. Smith also indicated that plaintiff denied symptoms for musculoskeletal issues, such as arthritis, joint pain, back problems, and restricted motion. (AR at 397.)

3. Additional Medical Evidence Submitted to Appeals Council

Dr. Smith submitted an addendum, dated May 24, 2014, to his December 26, 2013 report. (AR at 401-02.) In this addendum, Dr. Smith reported that, at plaintiff's request, the report was reviewed for inaccuracies, and "[b]ased on recollection and current examination," inaccuracies were noted in the original. (AR at 401.) Dr. Smith attributed the inaccuracies as "likely due to incorrect transfer of information from a different patient seen that day." (*Id.*) Dr. Smith reported that, contrary to his May 24, 2014 report, plaintiff acknowledged arthritis, joint pain, back problems, deformity of the knee, stiffness of the joints, and restricted range of motion in the knees, especially in the right knee. (AR at 401-02.) Dr. Smith also reported that plaintiff noted swelling of the legs and shortness of breath after walking 100 feet. (AR at 402.) Dr. Smith reported objective findings including obvious misalignment of the spine and knees, which were "clearly of longstanding duration and present at the time of exam on 12/26/2013." (*Id.*) Dr. Smith noted that plaintiff's right knee was in a severe valgum position with crepitus noted on range of motion testing. (*Id.*) He also reported decreased ankle, subtalar, and midtarsal ranges of motion, and significant pitting lymphedema. (*Id.*)

In a "To Whom It May Concern" letter, dated June 9, 2014, Dr. Nadroo stated that she had reviewed the December 12, 2012 questionnaire that she had completed previously and that "as per [her] notes at that time" plaintiff was "limited to sit for less than 6 hours per day." (AR at 404.)

On June 2, 2014, plaintiff visited Dr. Mitchell Goldstein of Orlin & Cohen Orthopedic Associates, LLP. (AR at 6-8.) Dr. Goldstein noted that plaintiff reported a history of low back and knee pain since 1981/1982 but had not attended physical therapy. (AR at 6.) Dr. Goldstein reported that plaintiff's pain was worse in the morning and with activity, but that it lessened with heat, rest, and prescribed medication. (*Id.*) Dr. Goldstein noted, on examination, that plaintiff was five feet, three inches tall and weighed 226 pounds. (AR at 7.) He reported that plaintiff had pain, and diminished flexibility, extension, rotation, and lateral bending in the lumbar spine. (*Id.*) He reported that plaintiff's bilateral lower extremities were intact. (*Id.*) Dr. Goldstein indicated that plaintiff's gait was antalgic, and she ambulated using a cane. (*Id.*) He recorded that flexion was to 100 degrees, extension and adduction to 5 degrees, abduction to 15 degrees, external rotation to 20 degrees, and internal rotation to 10 degrees. (*Id.*) He reported coordination, sensation, mood,

affect and orientation to time, place, and person were normal. (AR at 8.) He also found that radial, dorsalis pedis, and posterior tibial pulses were palpable. (*Id.*) Dr. Goldstein reported an assessment of knee pain, internal derangement of the knee joint, osteoarthritis of the knee, limp, lumbago, lumbar degenerative disc disease, sciatica, trigger point with back pain, herniated nucleus pulpous (lumbar), pelvic sprain, status post hip replacement, obesity, hypertension, and type II diabetes mellitus. (*Id.*) Dr. Goldstein advised weight loss and disco visco to the knees. (*Id.*) Dr. Goldstein reported that based on the plaintiff's medical and physical conditions, she was "permanently, totally disabled." (*Id.*)

4. Vocational Expert Evidence

On December 19 and December 26, 2013, David Vandergoot, Ph.D., responded to "Vocational Interrogatories" and provided evidence as a vocational expert. (AR at 92-94, 204-07, 213-16.) Dr. Vandergoot classified plaintiff's past work as a librarian as skilled and light in exertion. (AR at 204, 213.) He classified plaintiff's past work as an administrative clerk as semi-skilled and light in exertion, and her past work as a data entry clerk as semi-skilled and sedentary in exertion. (*Id.*) In this report, Dr. Vandergoot also responded to a series of hypotheticals. (AR at 214.) He indicated that a hypothetical individual able to perform the full range of sedentary work could perform plaintiff's past job as a data entry clerk. (*Id.*) He indicated that if a hypothetical individual was able to perform sedentary work, but could never kneel, crouch, or crawl and required the use of an assistive device, that individual could still perform the job of a data entry clerk and that walking with an assistive device would not be a deterrent. (*Id.*) However, Dr. Vandergoot responded that if the individual was absent from work two to three days a month, that individual could not perform plaintiff's past jobs as actually performed by plaintiff or as normally performed in the national economy because two to three days absent per month exceeds standards. (*Id.*)

B. Procedural History

On September 29, 2012, plaintiff applied for DIB, alleging disability due to spinal stenosis, herniated lumbar discs, osteoarthritis in her knees and left hip, weak legs, plantar fasciitis in both feet, bone spur in her right heel, type II diabetes, and depression and frustration. (*See* AR at 148, 151.) Plaintiff's claim was initially denied (AR at 62-70, 75-78), and plaintiff then requested a hearing before an ALJ. (AR at 79.) On December 18, 2013, plaintiff appeared *pro se* before ALJ April M. Wexler. (AR at 31-61.) ALJ Wexler informed plaintiff of her right to representation, and plaintiff chose to proceed without the assistance of a representative. (AR at 33-34.) On March 17, 2014, the ALJ denied plaintiff's claim, finding she was not disabled under the Act. (AR at 16-27.)

Plaintiff requested review by the Appeals Council (AR at 11-12), which was denied on July 24, 2014, making the ALJ's decision the final decision of the Commissioner. (AR at 1-5.)

Plaintiff filed this action on September 18, 2014. The Commissioner served the administrative record and filed an answer on January 16, 2015, and filed her motion for judgment on the pleadings on February 17, 2015. Plaintiff failed to file her opposition papers on March 17, 2015 as directed by the Court in its October 6, 2014 Order, and by Order dated April 30, 2015, the Court directed that plaintiff submit a letter by May 15, 2015, explaining why her case should not be dismissed for failure to prosecute. On May

14, 2015, plaintiff requested an extension of time to file her opposition papers in order to obtain new counsel. The Court granted plaintiff's request and extended her deadline to respond to June 29, 2015. However, plaintiff did not file her opposition by June 29, 2015, and by Order dated October 1, 2015, the Court directed that plaintiff submit a letter by October 15, 2015, explaining why her case should not be dismissed for failure to prosecute. On October 19, 2015, plaintiff filed a letter, which the Court treats as her opposition to defendant's motion for judgment on the pleadings.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) and 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix

12

1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. <u>Analysis</u>

1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ followed the five-step sequential analysis for evaluating applications for disability benefits. (AR at 21-25.)

a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of September, 29, 2012. (AR at 21.) The ALJ noted that, although plaintiff worked after the alleged disability onset date, this work activity did not rise to the level of substantial gainful activity because plaintiff worked part-time as a librarian and earned less than substantial gainful activity amounts. (*Id.*) Substantial evidence supports this finding.

b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits her capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the following severe impairments: lumbar degenerative disc disease, bone spur, bilateral knee degenerative joint disease, and obesity. (AR at 21.) The ALJ found that these impairments cause more than a minimal limitation in the plaintiff's ability to perform basic work activities. (*Id.*) The ALJ also referred to allegations of disability from

diabetes and hypertension, but found no testimony, emergency room visits or hospitalizations related to these ailments, which were well controlled by medication. (*Id.*) The ALJ ultimately found that diabetes and hypertension are "nonsevere impairments that cause no more than minimal, if any, limitations in the [plaintiff's] ability to perform basic work activities." (*Id.*) Substantial evidence supports these findings.

c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of the plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 22.) The ALJ considered listed impairments under section 1.00, the standard for musculoskeletal impairments, but found that the requisite criteria for the relevant listings were absent from plaintiff's medical records and that no treating or examining physician had indicated findings that would satisfy the requirements of any listed impairment. (*Id.*) The ALJ specifically considered the listed impairments under section 1.04, the standard for a spinal disorder, and found that "none of the medical records establishes findings or symptoms severe enough to qualify under listing 1.04." (*Id.*) The ALJ also considered the listed impairments under section 1.02, which "describes major dysfunction of a joint" and requires that, "if occurring in a major weight-being joint, i.e. the hip, knee or ankle, this must result in the inability to ambulate effectively" meaning "the individual cannot independently initiate, sustain or complete activities." (*Id.*)

The Court agrees with the ALJ's finding that plaintiff is not *per se* disabled due to back or knee pain. As to the plaintiff's back pain, "Section 1.04 of the List of Impairments requires a highly specific, medically determinable finding of a spinal disorder, (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromised of a nerve root (including the cauda equine) or the spinal cord." *Gonzalez v. Sec'y of the U.S. HHS*, 360 F. App'x 240, 244 (2d Cir. 2010) (internal citation and quotation marks omitted). Though there were multiple reports of plaintiff's complaints of back pain, "there would be no relevant diagnoses that would have supported a finding of *per se* impairment due to a spinal disorder pursuant to Section 1.04." *Id.* As to plaintiff's knee pain, "Section 1.02 of the List of Impairments requires, *inter alia*, a gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion . . . and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." *Id.* (internal citation and quotation marks omitted). Similarly, though plaintiff complained of knee pain and had been diagnosed with arthritis, there were no "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" during the relevant period. Thus, the Court finds that substantial evidence supports the ALJ's determination that plaintiff's back and knee impairments did not render her *per se* disabled.

d. Residual Functional Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id*. § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that she is not disabled. *Id.*

Here, the ALJ found that plaintiff had the "residual functional capacity to sit six hours and to stand/walk two hours in an eight-hour workday and lift/carry ten pounds occasionally, which is sedentary work as defined in 20 C.F.R. 404.1567(a) except never crouch, crawl, or kneel and needs to use an assistive device for ambulation." (AR at 22.)

The ALJ concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR at 24.) However, the ALJ found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (*Id.*) In arriving at this conclusion, the ALJ provided a detailed summary of the medical evidence and plaintiff's testimony. (AR at 23-25.)

The ALJ then proceeded to step four and concluded that plaintiff's RFC did not preclude her from performing past relevant work as a Data Entry Clerk. (AR at 25.) In coming to this conclusion, the ALJ relied on vocational expert evidence that a "Data Entry Clerk" is a semi-skilled job requiring a sedentary exertional capacity and that walking with an assistive device is not a deterrent. (*Id.*) The ALJ found that this work met the recency, durational, and earnings criteria for past relevant work, as it was performed within fifteen years of adjudication, for a "long enough period to learn and provide average performance" and performed at "substantial gainful activity levels." (*Id.*)

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id*. § 404.1560(c); *see, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

In this case, the ALJ found that plaintiff was able to perform her past relevant work as a data entry clerk. (AR at 25.) Therefore, the ALJ did not evaluate step five. (*Id.*)

2. Plaintiff's New Medical Evidence Presented on Appeal

a. Legal Standard

In seeking review of an ALJ's decision, a claimant may submit "new and material evidence" to the Appeals Council. 20 C.F.R. §§ 404.970 and 416.1470; *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996). "If the new evidence relates to a period before the ALJ's decision, the Appeals Council shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings,

or conclusion is contrary to the weight of the evidence currently of record." *Perez*, 77 F.3d at 44 (internal quotation marks and citations omitted). The claimant "must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (citing *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)); *see also James v. Comm'r of Soc. Sec.*, No. 06-CV-6108 (DLI/VVP), 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009) (same). Materiality is defined as "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Sergenton*, 470 F. Supp. 2d at 204 (citing *Lisa*, 940 F.2d at 43). The claimant must also show "good cause for her failure to present the evidence earlier," which is present where "the evidence surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding." *Id.* (citing *Lisa*, 940 F.2d at 44).

"When the Appeals Council fails to consider such evidence, 'the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence.'" *James*, 2009 WL 2496485, at *10 (quoting *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009)). Additionally, if the new evidence "consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion." *Id.* (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

b. Analysis

Plaintiff presented new medical evidence on appeal in the form of an addendum, dated May 24, 2014, submitted by Dr. Smith of Cherrywood Foot Care to his December 26, 2013 report. (AR at 401-02.) Dr. Smith reported that, at plaintiff's request, his December 26, 2013 report was reviewed for inaccuracies, and "[b]ased on recollection and current examination, inaccuracies [were] noted in the original." (AR at 401.) Dr. Smith attributed the inaccuracies as "likely due to incorrect transfer of information from a different patient seen that day." (*Id.*) Dr. Smith reported that, contrary to his May 24, 2014 report, plaintiff acknowledged arthritis, joint pain, back problems, deformity of the knee, stiffness of the joints, and restricted range of motion in the knees, especially in the right knee. (AR at 401-02.) Dr. Smith also reported that plaintiff noted swelling of the legs and shortness of breath after walking. (AR at 402.) Dr. Smith reported objective findings including obvious misalignment of the spine and knees, which were "clearly of longstanding duration and present at the time of exam on 12/26/2013." (*Id.*) Dr. Smith noted that plaintiff's right knee was in a severe valgum position with crepitus noted on range of motion testing. (*Id.*) He also reported decreased ankle, subtalar, and midtarsal ranges of motion, and significant pitting lymphedema, which was present on December 26, 2013. (*Id.*)

These findings are clearly in conflict with Dr. Smith's earlier report and other medical records that were considered by the ALJ. Namely, Dr. Smith's December 26, 2013 report indicated that plaintiff denied any symptoms for musculoskeletal issues, such as arthritis, joint pain, back problems, and restricted motion. (AR at 397.) Additionally, in his May 24, 2014 addendum, Dr. Smith opined that plaintiff had "obvious

misalignment of spine and knees" that were "clearly of longstanding duration and present at the time of the exam on 12/26/2013" as well as "[s]ignificant pitting lymphedema" noted bilaterally, which was also present during the December 2013 exam. (AR at 402.) Further, in the December 26, 2013 report, Dr. Smith reported no edema of the lower extremities (AR at 398), though, on August 15 and November 21, Dr. Sagar diagnosed plaintiff with edema, for which he prescribed Furosemide. (AR at 382, 385.)[4,5]

The Appeals Council indicated that it received additional evidence which it was making part of the record, including "Medical Evidence from Cherrywood Footcare Group dated December 26, 2013 (4 pages)." (AR at 5.) However, a review of the record indicates that this exhibit was the December 26, 2013 record with the May 24, 2014 addendum included at the end of the document. (*See* AR at 400-02.) Whereas the Appeal Council explicitly stated that it considered the June 2, 2014 report from Orlin & Cohen Orthopedic Associates LLP but disregarded it because it did not relate to the relevant time period (*see* AR at 2), the Appeals Council did not specifically indicate why it did not credit Dr. Smith's addendum. Instead, in the Appeals Council's denial of plaintiff's request for review, the Appeals Council merely stated that it considered "the additional evidence listed on the enclosed Order of Appeals Council" and found that "this information does not change a basis for changing the Administrative Law Judge's decision." (AR at 1-2.) This was insufficient and constitutes a ground for remand. *See Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL 1599944, at *14 (E.D.N.Y. Apr. 21, 2014) (finding remand warranted where Appeals Council listed physician's letter among additional evidence received and made part of the record, but merely stated that the newly submitted information did "not provide a basis for changing the Administrative Law Judge's decision."); *see also James v. Comm'r of Soc. Sec.*, No. 06-CV-6108 (DLI/VVP), 2009 WL 2496485, at *11 (E.D.N.Y. Aug. 14, 2009); *Toth v. Colvin*, No. 5:12-CV-1532 (NAM/VEB), 2014 WL 421381, at *6 (N.D.N.Y. Feb. 4, 2014); *Viverito v. Colvin*, No. 14-CV-7280 (JFB), 2016 WL 755633, at *14 n.6 (E.D.N.Y. Feb. 25, 2016). "[W]here newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must good give reasons for the weight accorded to a treating source's medical opinion." *James*, 2009 WL 2496485, at *10; *see also Glessing*, 2014 WL 1599944, at *14 (remanding for failure to provide rationale for disregarding newly submitted evidence of treating physician's opinion in Appeals Council's denial of request for review); *Toth*, 2014 WL 421381,

---

[4] Although the Commissioner argues that the addendum simply contained information that was contained elsewhere in plaintiff's medical records and that was thus already considered by the ALJ, much of the overlapping information was contained in medical records that pre-dated the relevant time period in this case. Thus, although the ALJ may have included such earlier medical information in her explanation of plaintiff's medical history, she was under no obligation to consider such evidence under 20 C.F.R. § 404.1512(d). *See McManus v. Comm'r of Soc. Sec.*, 298 F. App'x 60, 61 (2d Cir. 2008); *Krach v. Comm'r of Soc. Sec.*, No. 3:13-CV-1089 GTS/CFH, 2014 WL 5290368, at *4 (N.D.N.Y. Oct. 15, 2014). Further, the ALJ explicitly used Dr. Smith's December 2013 report to discredit the opinion of Dr. Nandroo. (*See* AR at 24 ("[T]he opinion is inconsistent with the examination of the claimant's podiatrist (Exhibit 13F).) Thus, it appears that Dr. Smith's addendum could have clearly altered the ALJ's analysis.

[5] Good cause for failing to present this evidence earlier is clear as the addendum is dated after the date of the ALJ's decision, and thus, plaintiff could not have obtained it during the pendency of the proceeding. *See Lisa*, 940 F.2d at 44.

17

at *6 (same). Here, because the Appeals Council failed to provide any reasons, let alone good reasons, for disregarding Dr. Smith's addendum, remand is warranted. [6]

*See Toth*, 2014 WL 421381, at *6. On remand, the Commissioner should consider Dr. Smith's addendum and evaluate it in accordance with the treating physician rule.[7,8]

---

[6] Plaintiff also submitted additional medical evidence from Dr. Goldstein of Orlin & Cohen Orthopedics to be reviewed by the Appeals Council. (AR at 6-8.) However, Dr. Goldstein's evaluation on June 2, 2014 was made after the ALJ's May 17, 2014 decision. The Second Circuit has made clear that, although "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the new administrative record for judicial review when the Appeals Council denies review of the ALJ's decision," the evidence "must relate to the period on or before the ALJ's decision." *Perez*, 77 F.3d at 45. Thus, because the evidence submitted to the Appeals Council concerned plaintiff's treatment after the ALJ hearing, the Appeals Council properly determined that Dr. Goldstein's evaluation did not affect the decision whether plaintiff was disabled beginning on or before March 17, 2014. *See, e.g.*, *Perez v. Barnhart*, 234 F. Supp. 2d 336, 342 (S.D.N.Y. 2002). ("The evidence submitted to the Appeals Council in this case concerned Plaintiff's treatment *after* the ALJ hearing. . . . Hence, the Appeals Council properly concluded that the additional evidence did not provide a basis for changing the ALJ's decision.").

[7] In her opposition, plaintiff argues that the ALJ failed to accord proper weight to the opinions of two different doctors that she was "completely disabled." (Pl.'s Opp'n at 1.) Plaintiff claims that "[t]he first was from the orthopedist at Nassau Orthopedic Medicine in July 2011, and the second from the orthopedist at Orlin & Cohen in September of 2013." (*Id.*) The record is devoid of any treatment history of plaintiff by Orlin & Cohen Orthopedics in September 2013. Thus, it appears that plaintiff is referring to Dr. Goldstein's June 2, 2014 evaluation, in which he notes that "[b]ased on her medical and physical conditions she is permanently totally disabled." (AR at 8.) For the reasons discussed *supra*, the Appeals Council properly determined that this additional medical evidence did not affect the ALJ's determination whether plaintiff was disabled beginning on or before March 17, 2014.

As to plaintiff's argument regarding her orthopedist at Nassau Orthopedic Medicine in July 2011, although plaintiff only notes the July 2011 opinion of disability by Dr. Montero of Nassau Orthopedic Surgeons, her treatment notes from May 4, 2011, indicate that, at this appointment, Dr. Montero informed plaintiff that "given the clinical finding and [history] of her being unable to walk > 100 ft, she is informed that this would indeed qualify her for disability." (AR at 265.) Subsequently, on July 11, 2011, Dr. Montero again noted that plaintiff was informed that her inability to walk more than 100 feet without pain would qualify her for disability. (AR at 263.) However, even though Dr. Montero did opine that plaintiff would qualify for a disability in May and July 2011, the ALJ was not required to evaluate his opinions because they predated the relevant time period in the case – September 29, 2012 (plaintiff's alleged onset date) through March 17, 2014. *See, e.g.*, *McManus*, 298 F. App'x at 61 ("[W]e see no error in the ALJ's decision to exclude additional evidence proffered by [plaintiff]. That evidence pre-dated the time period the ALJ was required to consider under 20 C.F.R. § 404.1512(d)."); *Williams v. Colvin*, 98 F. Supp. 3d 614, 631-32 (W.D.N.Y. 2015) (finding that ALJ was not required to evaluate May 6, 2010 opinions of two physicians that pre-dated the relevant time period where the plaintiff filed her DIB application on September 23, 2010); *Kentile v. Colvin*, No. 8:13-CV-880 MAD/CFH, 2014 WL 3534905, at *14 n.10 (N.D.N.Y. July 17, 2014) ("The administrative record contains treatment notes from other providers. However, the ALJ is not compelled to consider or assign weight to treatment that predates plaintiff's application for disability benefits."); *Krach*, 2014 WL 5290368, at *4 (concluding that ALJ was not required to consider records of hospitalizations that predated plaintiff's alleged onset date).

[8] The Court notes that plaintiff also submitted Dr. Nadroo's June 9, 2014 "To Whom It May Concern" letter to the Appeals Council. (*See* AR at 404.) In this letter, Dr. Nadroo opines that plaintiff was limited to sitting to less than 6 hours per day (AR at 404), which is somewhat different from her initial assessment, which did not contain a specific time limit, but rather just noted that plaintiff's ability to sit was limited based on blood clots. (AR at 337.) Because Dr. Nadroo's June 9, 2014 letter also constitutes new evidence that relates to the period on or before the ALJ's decision and could have impacted her analysis, and the ALJ previously determined that plaintiff had the RFC to sit for six hours (AR at 22), and because good cause is demonstrated because the letter was dated after the ALJ's decision was rendered, on remand, Dr. Nadroo's submission should be

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is denied. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 16, 2016
   Central Islip, New York

\* \* \*

The plaintiff is proceeding *pro se*. The attorney for defendant is Robert Capers, United States Attorney, Eastern District of New York, by Karen T. Callahan, 610 Federal Plaza, Central Islip, New York, 11722.

---

considered in accordance with the treating physician rule as well.